| | | |
|---|---|---|
| TASZ, INC., | ) | |
|         Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM and ORDER** |
| | ) | |
| INDUSTRIAL THERMO | ) | |
| POLYMERS, LTD., ART CYR, | ) | |
| STEVE HARTMAN, and RICK | ) | |
| FITZGERALD, | ) | |
|         Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| INDUSTRIAL THERMO | ) | |
| POLYMERS, LTD., | ) | |
|         Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TASZ, INC. and POLYCHEM | ) | |
| ALLOY, INC., | ) | |
|         Third-Party Defendants. | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendants Industrial Thermo Polymers, Ltd.

("ITP"), Art Cyr, Steve Hartman, and Rick Fitzgerald's (collectively, "Defendants") Motion to

Dismiss Plaintiff Tasz, Inc.'s ("Tasz") claims under Federal Rule of Civil Procedure 12(b)(6)

(Doc. 4), filed October 26, 2011; Defendants Art Cyr ("Cyr"), Steve Hartman ("Hartman"), and

Rick Fitzgerald's ("Fitzgerald") (collectively, "Individual Defendants") Motion to Dismiss

Tasz's Claims under Federal Rule of Civil Procedure 12(b)(2) (Doc. 6), filed October 26, 2011;

Defendants' Motion to Dismiss Third-Party Defendant Polychem Alloy, Inc.'s ("Polychem")

Amended Answer to Third-Party Complaint and Counterclaims under Rule 12(b)(6) and, in the

alternative, Motion to Compel a More Definite Statement pursuant to Rule 12(e) (Docs. 37, 39), filed March 9, 2012; Defendants' Motion to Strike Polychem's Amended Answer and Counterclaims under Rule 12(f) (Doc. 41), filed March 9, 2012; Individual Defendants' Motion to Dismiss Polychem's Amended Answer and Counterclaims under Rule 12(b)(2) (Doc. 35), filed March 9, 2012; Tasz's Motion to Dismiss ITP's Counterclaims under Rule 12(b)(6), filed December 15, 2011 (Doc. 23); and Polychem's Motion to Dismiss ITP's Third-Party Complaint under Rule 12(b)(6), filed February 9, 2012 (Doc. 34); and ITP's Rule 41(b) Motion to Dismiss all claims advanced by Tasz and Polychem (Doc. 54).

## I.    PROCEDURAL BACKGROUND

Tasz commenced this action in the General Court of Justice, Superior Court Division, Caldwell County, North Carolina on September 19, 2011. (Case Number 11-CVS-1311) (Doc. 1-1 at 2.) On October, 19, 2011, Defendants timely removed the matter to federal court on the basis of original jurisdiction under 28 U.S.C. § 1332(a). (Doc. 1 at 2.) Subject matter jurisdiction is proper as Tasz and Polychem are North Carolina corporations, Defendants are foreign corporations and citizens, and the amount in controversy exceeds $75,000. (*Id.*)

On October 20, 2011, ITP filed an Answer to Tasz's Complaint, Counterclaims against Tasz, and a Third-Party Complaint against Polychem. (Doc. 3.) On February 9, 2012, Polychem filed its Amended Answer to the Third-Party Complaint along with Counterclaims against Defendants. (Doc. 20.)

## II.    FACTUAL BACKGROUND

This dispute arises from Tasz's acquisition of the assets of Neocork Technologies Corporation ("Neocork"). The relevant entities, Tasz, Polychem, ITP, and Neocork, are involved in the business of manufacturing and distributing synthetic corks for the wine and spirits industry. Both Tasz and Polychem are North Carolina corporations with their principal places of business located in Lenoir, North Carolina (Doc. 3 at 29.) Chakra Gupta ("Gupta") serves as President and Chief Executive Officer for Tasz and Polychem. (Doc. 3 at 29.) Neocork is a Delaware corporation with its principal place of business in Napa, California. (Doc. 3 at 29-30.) Neocork is not currently operative and is not a party to the instant lawsuit.  Neocork's President and chairman of the board of directors was Jim Williams ("Williams") (Doc. 34 at 18 ¶ 30). The remainder of the Neocork's Board of Directors was composed of Hartman, Cyr, and Fitzgerald until at least May 25, 2010. (Doc. 1-1 at 7-8.) In communications to Tasz, Neocork lists Hartman, Cyr, and Fitzgerald's addresses as ITP's business address. (Doc. 34-2 at 15.) ITP is a Canadian corporation with its principal place of business in Brampton, Ontario, Canada. (*Id.* at 28.) Hartman, a Canadian citizen, is the President and Chief Executive Officer of ITP. (Doc. 3 at 28.) Cyr, also a Canadian citizen, is the Executive Vice President of ITP. (Doc. 3 at 28.)  Both Hartman and Cyr held these positions at ITP while serving on the board of directors for Neocork. Fitzgerald is likewise a citizen and resident of Canada.

From January 2006 to May 2010, ITP manufactured corks exclusively for Neocork. (Doc. 3 at 29-30.) ITP fulfilled all of its obligations under the manufacturing agreement with Neocork but by October 2007, Neocork was approximately $2,000,000 behind on payments due to ITP.

(Doc. 3 at 30.) Over the next three years, Neocork continued to accrue debts to other entities. Neocork owed $400,000 to Polychem arising from shared business relations providing specialty polymers and by early 2010, Neocork was in default on loans owed to its secured creditor, Critical Capital Growth Fund, L.P. ("Critical Capital"), in the amount of $2,100,000. *Id.*

At this time, Gupta and Williams were in contact with one another regarding Neocork's debts to Polychem. In these conversations the idea emerged for a buyer to purchase Neocork's assets and assume the liabilities owed to creditors. (Doc. 34 at 17, ¶ 16.) This resulted in the creation of Tasz as the buyer and a February 1, 2010, "letter of intent to purchase" sent from Tasz and Polychem to Neocork. (Doc. 34 at 18, ¶ 30.) An agreement was reached and Neocork, Critical Capital, ITP, Tasz, and Polychem entered into an Asset Purchase Agreement ("APA") that provided for Tasz's acquisition of Neocork's assets in exchange for: (1) Tasz's assumption of Neocork's liabilities; and (2) Tasz's entrance into a separate manufacturing agreement with ITP ("Manufacturing Agreement"). (Doc. 3-2 at 8, 10.) The liabilities assumed by Tasz included payments to Critical Capital on the $2,100,000 owed and the $400,000 owed to Polychem. (Doc. 3-2 at 10.) The APA was executed by the parties on May 19, 2010.[1] (Doc. 3-2 at 1, bottom of page.)

On April 19, 2010, as required by the yet to be executed APA, Tasz and ITP entered into the Manufacturing Agreement. (Doc. 3 at 33.) The basic terms of the Manufacturing Agreement

---

[1] Fitzgerald was the sole signatory for Neocork's approval of the APA and temporary reinstatement of Williams as President of Neocork for the purpose of executing the APA. (Doc. 34-15.) Hartman and Cyr recused themselves from approving this resolution "in light of ITP's financial interest in the subject transactions." (*Id*. at 4.)

provided for ITP's production of corks exclusively for Tasz and Tasz's purchase of no less than one hundred million corks, per year, for a period of five years. (Doc. 3-5 at 4.) In Section 7.4 of the Manufacturing Agreement, Polychem agreed to guarantee Tasz's payments to ITP arising from the Manufacturing Agreement.[2] (*Id.* at 13.) Paragraph 4.1 of the Manufacturing Agreement provides that the specifications for the corks produced for Tasz will remain the same as those produced for Neocork.[3] (Doc. 3-5 at 9.) Below is the Manufacturing Agreement's definition for "confidential information."

> (d)     "Confidential Information" shall mean all information disclosed in confidence to [ITP], at any time prior to the Term of this agreement by NeoCork as well as during the Term of this Agreement, by or on behalf of [Tasz], either directly or indirectly, and relating to the manufacture of synthetic beverage closures or to [Tasz]. Such confidential and proprietary information of [Tasz] may include, without limitation:
>
>> (i)     Confidential and proprietary information supplied to [ITP];
>>
>> (ii)     [Tasz's] technology, including discoveries, inventions, research and developments efforts and results thereof, data, trade secrets, processes, samples, formulas, algorithms, methods, products, know-how and show-how;
>>
>> (iii)     The Product Specifications;
>>
>> (iv)     Any Demand Forecast (as defined in Section 3.2 of this Agreement);
>>
>> […]

---

[2] The Court will refer to this guarantee by Polychem as the "Manufacturing Guarantee."

[3] Section 4 also provides for a 97.5% quality acceptance level (Doc. 3-5 at 10, ¶ 4.3), ITP's duty to provide a corrective action program at the first notice of non-compliance with the acceptance level (*Id.* at ¶ 4.4), and ITP's duty to maintain records, available upon Tasz's request, for product testing, evaluation, and quality compliance. (*Id.* at 4.5.)

(vi)     Information of third-parties as to which [Tasz] has an obligation of confidentiality; and

(vii)    Market information, including customers or distributors and competitor intelligence.

Confidential Information does not include:

(i)      Information which [ITP] can establish was in its possession at the time of initial disclosure by supply of written record;

(ii)     Information that now or later becomes part of the public domain, unless such information becomes part of the public domain as a result of any fault on the part of Manufacturer;

[…]

(iv)     Information received by [ITP] from a third-party who is not under an obligation of confidentiality to [Tasz] or [Tasz] by and through [ITP], where such information was lawfully obtained by the third party.

(Doc. 3-5 at 2-3.) Section 7 of the Manufacturing Agreement governs use of confidential information and grant of the production license and mandates that "[ITP] shall not use the Confidential Information to manufacture or commercialize: (a) the [corks] for itself or any third party." (Doc. 3-5 at 12, ¶ 7.1.) Finally, paragraph 8.3 gives either party the right to terminate the agreement 30 days after the other party receives written notice of a material breach (*Id.* at 14). However, the parties agree that the terms relating to confidential information and licensing "survive the Term and termination of the [Manufacturing Agreement]." (*Id.* at 15, § 11.)

On April 27, 2010, prior to the execution of the APA, Polychem sent ITP an additional payment guarantee. This guarantee assured payment for corks shipped by ITP to Neocork prior

to the APA closing.[4] (Doc. 3-4.) The guarantee states that Polychem's promise to pay is made "[in] an effort to sustain continuity and product flow between [Neocork] and its customers, and in consideration of a pending transaction whereby the assets of [Neocork] will be sold to [Tasz]." (*Id.*) Additionally, the guarantee provides that any unpaid invoices owed to ITP after execution of the APA will be assigned to and paid by Tasz. (*Id.*)

Therefore, as of May 25, 2010, Tasz began selling Neocork brand corks exclusively manufactured by ITP pursuant to the intellectual property license granted by Tasz. (Doc. 1-1 at 9.) Issues emerged immediately under the terms of the APA and Manufacturing Agreement.

Tasz's claims for relief arise from two central allegations: (1) ITP fraudulently induced Tasz's purchase of Neocork's assets by misrepresentation and the omission of material facts regarding the status and health of Neocork's business; and (2) ITP did not comply with the terms of the Manufacturing Agreement, quickly ceased shipment of Neocork brand corks to Tasz, and simultaneously began soliciting Tasz's customers for direct purchase orders of Neocork brand corks. Tasz makes a number of factual allegations in support of these claims.

Tasz alleges that Hartman and Cyr's presence in the leadership ranks of both Neocork and ITP allowed them to exert influence over Fitzgerald as the signatory board member of the APA for Neocork. Tasz also alleges that Neocork's Delaware corporate license to do business was suspended during the time of negotiations and Hartman and Cyr were aware of this as

---

[4] The Court will refer to this guarantee by Polychem as the "Cork Guarantee." The Cork Guarantee lists container numbers 57, 58, 1, 2, and 3 shipped between March 2 and April 15, 2010, as specifically covered by the Cork Guarantee, along with any additional cork sold. (Doc. 3-4.)

evidenced by their immediate resignation from Neocork's board of directors after execution of the APA.

In the Complaint, Tasz alleges that for the entire period of manufacturing, May 25, 2010 to May 2011, ITP failed to produce a cork comparable to prior productions of Neocork branded corks. (*Id.*) Tasz alleges that as early as January 1, 2011, ITP was notified of issues regarding the manufacture and supply of the Neocork brand cork being produced. (*Id.*) Tasz alleges that ITP promised to investigate and correct any issues by April 14, 2011, but the problems were not corrected by this date and instead, ITP refused to continue manufacturing Neocork brand cork for shipment to Tasz. (*Id.*) It is clear from a series of emails between Gupta and Hartman beginning on April 14, 2011, that there was also a dispute as to whether Tasz was current on payments owed ITP.[5] (Doc. 1-1, Ex. 3, 4, 5, 6, 7 at 45-63.) These disagreements between Tasz and ITP produced a stalemate in business relations and ended in ITP sending a May 31, 2011, "Notice of Default" to Tasz and Polychem for material breach of the Manufacturing Agreement. (Doc. 1-1, Ex. 8 at 65.) Finally, Tasz alleges that on or about September 12, 2011, the executive vice president of ITP, Cyr, contacted Tasz's customer, Bramlage Verschlusse GmbH ("Bramlage"), and solicited purchase orders for Neocork brand corks to be acquired directly from ITP, instead of through Tasz. (Doc. 1-1 at 10-11.)

---

[5] These emails are proper for the Court to consider because they were attached as exhibits to Tasz's Complaint. Fed. R. Civ. P. 10 ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Demetry v. Lasko Products, Inc.*, 284 F. App'x 14, 15 (4th Cir. 2008).

Also relevant, this suit is the second suit filed by Tasz arising from this dispute. In March of 2011, Tasz filed a lawsuit against Critical Capital, Neocork, and Charlie Robinson ("Robinson") in Superior Court of Caldwell County, North Carolina. (Doc. 1-1, Ex. 9 at 68.) Robinson was a member of the board of directors of Neocork and was also the Chief Investment Officer for Critical Capital. (Doc. 34-1 at 3.) The first state suit alleged fraud, deceptive trade practices, and breach of contract in connection to the APA and resulted in a September 6, 2011, Order of Default Judgment against Neocork for an amount of $3,581,712.68, to be trebled to a grand total of $10,745,138.04.[6] (*Id.* at 69.)

## A. Tasz's Claims

Tasz asserts seven claims for relief. Claim One alleges breach of contract and breach of warranties under the APA and Manufacturing Agreement. (Doc. 101 at 11.) Claim Two alleges breach of the implied covenants of good faith and fair dealing under these same contracts. (*Id.* at 12.) Claim Three alleges fraud against ITP, Hartman and Cyr for fraudulently representing Neocork's corporate status and book of business in order to cause Tasz to enter into the APA. (*Id.* at 13.) Claim Four alleges misappropriation of trade secrets and intellectual property based on ITP's alleged solicitation of Bramlage following the Notice of Default letter and apparent termination of the Manufacturing Agreement. (*Id.*) Claim Five alleges violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") by ITP for using ITP's "position as exclusive third-party manufacturer of cork products to force [Tasz] to pay for

---

[6] The Court will refer to this first state suit and the corresponding default judgment award as the "State Court Default Judgment."

amounts not legitimately owed." (*Id.* at 15.) Claim Six alleges director and officer liability and asks that this Court pierce Neocork's corporate veil to hold Hartman, Cyr, and Fitzgerald personally liable. (*Id.* at 16-17.) Claim Seven requests a permanent injunction enjoining ITP, Cyr, and Hartman from contacting Tasz's customers and competitors or disclosing confidential information.[7] (Doc. 1-1 at 18-19.)

### B. ITP's Counterclaims

ITP alleges two counterclaims against Tasz and one third-party claim against Polychem. Claim One alleges breach of the Manufacturing Agreement by Tasz. (Doc. 3 at 40.) Claim Two asks for a declaratory judgment defining the respective rights and obligations of Tasz and ITP under the Manufacturing Agreement. Claim Three alleges breach of the Manufacturing Guarantee by Polychem for failing to pay amounts owed ITP in light of Tasz's failure to do so. (*Id.*)

### C. Polychem's Counterclaims

Polychem's response to ITP's claim was filed on December 15, 2011. (Doc. 20.) Polychem's Amended Motion to Dismiss, Answer to Third Party Complaint, Affirmative Defenses, and Counterclaims (Doc. 34) was filed February 9, 2012, following the grant of a

---

[7] Tasz's seventh claim for relief also requested a preliminary injunction enjoining ITP, Hartman, and Cyr from contacting Tasz's customers and competitors or disclosing confidential information. (Doc. 1-1 at 18-19.) This motion is denied because Tasz has failed to show any "likelihood of irreparable harm." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). This suit was filed in 2011 and Tasz has not made any reference to the preliminary injunction request in filings with the Court. Tasz has produced no evidence of actions taken by ITP, Hartman, or Cyr in the intermediate period that would cause irreparable harm or that a monetary damage award to Tasz constitutes an inadequate remedy.

Consent Motion for Leave to Amend/Correct Polychem's First Affirmative Defense / Counterclaim. (Doc. 30.) Polychem has alleged six counterclaims against ITP that are similar to those claims made by Tasz against ITP. In some instances, Polychem simply incorporates by reference the exact claims made by Tasz against ITP. (Doc. 34 at 29.)

## III.    ANALYSIS

### A.    Defendants' Motions to Dismiss Under FRCP 8(a), 10(b), and 12(b)(6)

Defendants have moved to dismiss Tasz's claims  and Polychem's counterclaims under Rules 8, 9(b), 10(b), and 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 8 provides the general rules of pleading and requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8; *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007). Rule 10(b) provides further guidance and requires that claims or defenses be set out in "numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Finally, Rule 9(b) provides a heightened standard of pleading where a party alleges fraud, as Tasz and Polychem have done here, and requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The purpose of such a heightened pleading standard is to ensure adherence to the basic policy that 'unfounded fraud claims should be identified and disposed of early.' " *Elec. Workers Pension Trust Fund of IBEW Local Union No. 58 v. CommScope, Inc.*, 5:10CV62-RLV, 2013 WL 4014978 (W.D.N.C. Aug. 6, 2013) (citing *Teacher's Ret. Sys. of La. v. Hunter,* 477 F.3d 162, 171 (4th Cir. 2007) and quoting 5A Charles A. Wright & Hunter M. Miller, *Federal Practice and Procedure* § 1296 (3d ed.2004)).

A Rule 12(b)(6) motion is a defense to a claim for relief and provides for dismissal where a party has failed "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the facts alleged must be sufficient "to raise a right to relief above the speculative level" and state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 546-47, 127 S.Ct. 1955, 1964, 1960 167 L.Ed.2d 929 (2007). A district court reviewing a Rule 12(b)(6) motion "assumes all well-pled facts to be true" and "draw[s] all reasonable inferences in favor of the [non-moving party]." However, a reviewing district court comes to its own legal conclusions based on the facts and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations and quotations omitted).

1. *Tasz's Claim for Breach of Contract and Breach of Warranties*

Claim one alleges breach of contract and breach of warranties by ITP. To make a claim for breach of contract, a party must show the existence of an agreement, an obligation contained in that agreement that has not been fulfilled by the opposing party, and resulting injury to the non-breaching party. *Harrington v. Perry*, 406 S.E.2d 1, 2 (N.C. App. 1991) (citing *Cantrell v. Woodhill Enters., Inc.*, 160 S.E.2d 476, 481 (N.C. 1968)). The general rule is that only a party in privity to a contract has standing to make a claim for breach of contract. An exception to this rule is made for third party beneficiaries to a contract. "Where the contracting parties intended that a third person should receive a benefit which might be enforced in the courts," that third person becomes a direct third party beneficiary and is allowed to make a claim of right under the

contract. *Vogel v. Reed Supply Co.*, 177 S.E.2d 273, 279 (N.C. 1970) (citations omitted). The

framework for analyzing direct third party status in North Carolina is explained below:

> Third party beneficiaries are divided into three groups: Donee beneficiaries, where it appears that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary; Creditor beneficiaries, where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary; and Incidental beneficiaries, where the facts do not appear to support inclusion in either of the above categories. While duties owed to donee beneficiaries and creditor beneficiaries are enforceable by them, a promise of incidental benefit does not have the same effect. An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.

*Id.* at 278 (internal quotations omitted). Third party beneficiary status is determined by a review

of the "circumstances surrounding the transaction as well as the actual language of the contract."

*Holshouser v. Shaner Hotel Grp. Properties One Ltd. P'ship*, 518 S.E.2d 17, 25 (N.C. App.

1999) aff'd, 524 S.E.2d 568 (N.C. 2000).

Tasz's claims for breach of the Manufacturing Agreement based on ITP's alleged

disclosures to Bramlage and claims for breaches of Sections 4 and 5 of the Manufacturing

Agreement, survive Rule 12(b)(6) review. Tasz has provided sufficient factual allegations

showing the existence of an agreement with ITP, the obligations of ITP flowing from this

agreement, and ITP's failure to fulfill these obligations.

Tasz's claim for ITP's breach of the APA is dismissed for failing to state a claim upon

which relief can be granted. A basic element of a claim for breach of contract is a showing that

the party accused has failed to fulfill an obligation owed. Here, the APA provides for Tasz's

purchase of the assets of Neocork in exchange for Tasz assuming responsibility for Neocork's

liabilities. ITP joined as a party to the APA for the limited purpose of promising to enter into a

manufacturing agreement with Tasz. (Doc. 3-2 at 15, ¶ 2.7(b)(i).) ITP fulfilled this obligation, therefore, Tasz has no basis for alleging ITP breached the APA.

All other attempted claims from the first claim for relief will be dismissed for the following reasons.

In part of claim one, Tasz alleges that ITP has "breached agreements between [Polychem] and [ITP] by failing to supply good and merchantable corks" and that "the agreement between Polychem and ITP had implied warranties, including warranties of merchantability and fitness for a particular purpose." (Doc. 1-1 at 11, ¶¶ 56-57.) Tasz requests relief pursuant to these "agreements" as a third party beneficiary. These claims will be dismissed because Tasz has failed to show that it is "entitled to relief" as required by Rule 8. Fed. R. Civ. P. 8(a)(2). This section of Tasz's complaint fails to identify the specific "agreements" referenced and does not even make an affirmative statement that a warranty was breached. Simply stating that an agreement "had implied warranties" does not amount to a sufficient allegation for breach of implied warranties.

Alternatively, putting aside the Rule 8 deficiencies, these allegations fail to state a plausible claim for relief as required by review under Rule 12(b)(6). Bare statements that a party has breached "agreements" and that implied warranties are in existence are proper for dismissal because they fail to put the opposing party on notice of the claims made against it and fail to provide the Court with the any facts to support a plausible conclusion that the contract was breached. Further, any claims that are dependent upon Tasz's asserted third party beneficiary status will be dismissed because Tasz fails to identify any separate contract between Polychem

and ITP, much less make an argument as to how this separate contract confers a legally enforceable benefit to Tasz as a donee or creditor beneficiary. Although Tasz fails to identify any agreement in the claim for relief, the Cork Guarantee is the only agreement between Polychem and ITP. (Doc. 3-4.) The Cork Guarantee explicitly states that the guarantee was made "[in] an effort to sustain continuity and product flow between [Neocork] and its customers, and in consideration of a pending transaction whereby the assets of [Neocork] will be sold to [Tasz]." *Id.* Under these terms, neither party breached this contract. ITP went forward with the closing of the APA and, presumably, Polychem was willing and able to make the promised payments if called upon to do so. Further still, the claim for breach of the Cork Guarantee must be dismissed because Tasz only alleges problems with corks produced between May 25, 2010, and May 2011 (Doc. 1-1 at 9, ¶ 21); the corks covered by the Cork Guarantee would be those already in existence (see footnote 3, *supra*), and corks produced prior to May 19, 2010, the date of execution of the APA. (Doc. 3-2 at 1, bottom of page.) Plainly put, Tasz's allegations claiming third party beneficiary status to agreements between Polychem and ITP are not plausible and are dismissed.

Additionally, the Court will not permit Tasz's claims for ITP's breach of "numerous and various warranties set forth in the APA" to serve as a proper claim for violation of any implied warranties. Although the Manufacturing Agreement fails to explicitly disclaim the implied warranty for merchantability, Tasz's Complaint does not refer to this warranty as a basis for a claim as required by Rules 8 and 10(b) of the Federal Rules of Civil Procedure. (Doc. 3-5 at 11, ¶ 5) (Manufacturing Agreement only disclaims warranty of fitness for particular purpose); N.C.

Gen. Stat §25-2-316(2) (providing that the word "merchantability" must be used to properly disclaim the implied warranty in a contract.) The all-encompassing claims by Tasz are proper for dismissal because they fail to put the opposing parties on notice as to what claims must be defended against.

   2.   *Tasz's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing*

Claim two alleges breach of the Manufacturing Agreement's implied covenant of good faith and fair dealing by ITP. (Doc. 1-1 at 12, ¶ 70-71.) The implied covenant of good faith and fair dealing is a part of every contract and is breached where one party to a contract does something that "injures the right of the other to receive the benefits of the agreement." *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 567 S.E.2d 781, 789 (N.C. App. 2002) *aff'd,* 577 S.E.2d 620 (N.C. 2003) (citing *Bicycle Transit Authority v. Bell¸* 333 S.E.2d 299, 305 (N.C. 1985)).

In this claim, Tasz alleges that ITP ignored Tasz's requests for ITP to investigate and explain discrepancies in billing practices and issues with the quality of cork being produced by ITP. (Doc. 1-1 at 12, ¶ 65.)  Tasz alleges that instead of handling these complaints in good faith, ITP ceased production and shipment to Tasz and began soliciting orders directly from Tasz's customers. (*Id.* at ¶ 68.)

Assuming the truth of the factual allegations contained in the Complaint and viewing all reasonable inferences in Tasz's favor, Tasz has sufficiently pleaded a cause of action for breach of the Manufacturing Agreement's implied covenant of good faith and fair dealing to survive a Rule 12(b)(6) challenge.

*3. Tasz's Claim for Fraud*

Claim three alleges fraud by Hartman, Cyr, and ITP. (Doc. 1-1 at 12-13.) In addition to the heightened pleading standard required Rule 9(b), a *prima facie* claim for fraud in North Carolina requires showing: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) that was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 189 (4th Cir. 2007) (citing *Forbis v. Neal*, 649 S.E.2d 382, 387 (N.C. 2007)). "Additionally, any reliance on the allegedly false representation[ ] [or concealment] *must be reasonable*." *Id.* (Emphasis added.)

Here, Tasz alleges that Hartman and Cyr fraudulently represented Neocork's financial records and corporate status. (Doc. 1-1 at 13, ¶¶ 75-75.) Tasz also alleges that Hartman and ITP "fraudulently denied knowledge and involvement with frauds of [Neocork]." *Id.* at 77. Finally, Tasz alleges that on April 26, 2011, Hartman "made fraudulent representations to Defendant [sic] intending to prevent Gupta from learning of ITP and the other individual Defendants responsibility for liability relating to [Neocork]." *Id.* at 82.

Tasz's fraud claims based on representation of Neocork's corporate status will be dismissed for failure to state a claim upon which relief may be granted. Paragraph 4.1 of the APA states: "Neocork is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Neocork may not be in good standing in Delaware due to and as a result of 2009 franchise taxes have not yet been paid." (Doc. 3-2 at 17.) Regardless of the obvious conflict between these two statements, there is no doubt that the second sentence

puts Tasz on notice that Neocork has not paid taxes which may effect Neocork's standing in the state of Delaware. Such notice makes it unreasonable for Tasz to make any assumptions as to Neocork's corporate status or to rely on any representations to that effect.

Tasz's claims for "frauds of [Neocork]," and "fraudulent representations" made on April 26, 2011, will be dismissed for failure to comply with the specificity requirement of FRCP 9(b). The claims are nothing more than bald accusations and operative words lacking any supporting facts or context illustrating inaccuracy, deception, or an intent to deceive. These claims do not even provide the Court or other parties with notice of what information was communicated or not communicated in a fraudulent manner.

Tasz's final claim for fraud arises from the representations of Neocork's corporate records and is alleged against ITP, Hartman, and Cyr. This claim will be allowed to proceed. Tasz was given access to and inspected the financial records of Neocork prior to entering the APA. (Doc. 3-2 at 18, ¶ 4.5) Although the Complaint fails to specify whether these records were entirely false or misrepresented in some way, Tasz has alleged that it relied on these records in executing the APA only to discover the records did not accurately represent the reality of Neocork's business health. In allowing this claim to survive Rule 12(b)(6) review, the Court assumes that Tasz will be capable of marshalling facts to show the deceptive nature of these records.

####### 4. Tasz's Claim for Misappropriation of Trade Secrets and Intellectual Property

Claim four alleges misappropriation of trade secrets and intellectual property against ITP. (Doc. 1-1 at 13-15, ¶¶ 86-103.) North Carolina General Statute Section 66-152 defines trade secrets as:

> (3) business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). Section 66-152 defines misappropriation of trade secrets as the, "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was . . . obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1).

The production process and technical specifications for Neocork brand corks were assets of Neocork purchased by Tasz under the APA. The APA defines these assets as confidential information and this information was licensed to ITP under the Manufacturing Agreement for the limited purpose of providing Neocork brand corks exclusively to Tasz. As such, Tasz's allegations of ITP"s attempted sale of Neocork brand corks to a third party without Tasz's permission states a plausible claim for misappropriation of trade secrets. The production specifications for Neocork brand corks are the trade secrets and the attempted sale outside the

terms of the license constitutes misappropriation. Additionally, the alleged act of attempting to solicit an existing customer of Tasz also states a sufficient claim for misappropriation of trade secrets. From this alleged conduct, the Court can infer in favor of Tasz that ITP used Tasz's confidential information to identify and formulate a sales offer to Bramlage.

ITP argues that their solicitation of Neocork brand corks directly to Tasz's customers was an appropriate response to Tasz's failure to pay for corks produced. This argument is dependent upon the outcome of the parties' cross claims for breach of contract and is better suited for summary judgment review or trial.

    *5.   Tasz's Claim for Violation of NCUDTPA*

Claim five alleges violations of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") by ITP, Hartman, and Cyr. (Doc. 1-1 at 15-16, ¶¶ 104-119.) To state a valid claim for violation of the NCUDTPA, a plaintiff must show: (i) that the defendant engaged in an unfair or deceptive act or practice; (ii) the act or practice was in or affecting commerce; and (iii) the act proximately caused injury to the plaintiff. *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 280 (4th Cir. 2012) (citing *Spartan Leasing v. Pollard*, 400 S.E.2d 476, 482 (N.C. App. 1991)); N.C. Gen. Stat. § 75-1-1 (2011). "An act is unfair when it is unethical or unscrupulous, and it is deceptive if it tends to deceive." *Id.* (citing *Marshall v. Miller*, 376 S.E.2d 397, 403 (N.C. 1981)).

Assuming the truth of the allegations and taking all inferences in Tasz's favor, Tasz has stated a plausible claim for relief for ITP's violation of the NCUDTPA. ITP and Tasz entered into a contract that required ITP to produce Neocork brand corks exclusively for Tasz. Tasz was

required to purchase a large amount of these corks and ITP was not otherwise permitted to produce Neocork brand corks for sale. However, assuming Tasz's allegations to be true, ITP failed to comply with the terms of this contract and also failed to respond in good faith when Tasz attempted to negotiate disputes. Simultaneous to this course of conduct, ITP attempted to cut Tasz out of the picture and solicited Tasz's existing customers for direct sale of Neocork brand corks. This alleged conduct was in or affecting commerce, caused injury to Tasz, and can arguably be characterized as deceiving, unethical, or unscrupulous. Therefore, Tasz has stated a plausible claim for violation of the NCUDTPA by ITP, Hartman, and Cyr.

     *6.   Tasz's Claim for Director and Officer Liability/Piercing the Corporate Veil*

     Claim six requests that this Court hold the Individual Defendants personally liable for the award in Tasz's State Court Default Judgment on the basis of breach of fiduciary duties. Claim six also asks this Court to pierce Neocork's corporate veil, making Neocork's "directors and officers responsible for the liabilities" claimed in this suit. (Doc. 1-1 at 18, ¶¶ 146-147.)

     Tasz's claim for director and officer liability alleges that Individual Defendants' failure to follow corporate formalities constitutes a breach of fiduciary duty. (Doc. 1-1 at 16, ¶ 122.) An essential element of this claim is a showing that a fiduciary relationship existed between the parties. Delaware law controls whether Tasz and Neocork were in a fiduciary relationship with Neocork's board of directors.[8] Under Delaware law, "directors owe their fiduciary obligations to

_____

[8] This matter is before this Court on the basis of diversity, therefore, North Carolina's choice of law is controlling. *New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 255 (4th Cir. 1991) (citations omitted). North Carolina follows the "internal affairs doctrine," which provides that the law of a corporation's state of incorporation controls disputes regarding the internal affairs of the corporation. *Minute Man Anchors, Inc. v. Oliver Technologies, Inc.*, 1:04 CV 27, 2005 WL 1871164 (W.D.N.C. Aug.

the corporation and its shareholders," and to creditors only in the case of derivative actions, but not direct actions. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99, 103 (Del. 2007). Because Tasz is not a shareholder of Neocork and Tasz is not owed money by Neocork in a creditor-debtor capacity, Tasz does not have standing to assert a claim for breach of fiduciary duty. Assuming, for the purposes of argument, that Tasz could be considered a creditor of Neocork, the Complaint alleges injuries to Tasz with the remedies flowing to Tasz.[9] Such a claim by a creditor is impermissible under Delaware law because it states a direct action. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (Whether a claim is direct or derivative turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?")) Therefore, Tasz's claim for director and officer liability is dismissed.

Tasz's request to pierce Neocork's corporate veil is also controlled by Delaware law. (Footnote 7, *supra*) To maintain such an action, Tasz must plead sufficient facts to show that some fraud or injustice was committed through misuse of the corporate form. *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, CIV.A. 19760-NC, 2004 WL 415251 (Del. Ch. Mar. 4, 2004)

---

5, 2005) (citing *DeWitt v. Hutchins*, 309 F.Supp.2d 743, 751 (M.D.N.C. 2004) (when "faced with a choice-of-law question regarding the equitable remedy of piercing the corporate veil, the North Carolina Supreme Court would adopt the internal affairs doctrine and apply the law of the state of incorporation.)).

[9] See language in Tasz's Complaint providing that "[Neocork] had obligations to Tasz" (Doc. 1-1 at 17, ¶ 127), that *Tasz's* reliance was abused (*Id.* at ¶ 126), and that in "winding up" Neocork the Individual Defendants had "an obligation and duty to Tasz." (*Id.* at ¶130.)

(citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (a showing of "[f]raud or something like it is required."))

Here, Tasz has alleged that Individual Defendants, in their capacity as directors of Neocork, abused the protection of the corporate status of Neocork to effectuate a business transaction that ultimately benefitted, ITP, a separate corporation where Hartman and Cyr currently serve as officers. Tasz failed to plead sufficient allegations to sustain claims for fraud under the heightened pleading standards of FRCP 9(b), but the facts surrounding the negotiations of the APA and Manufacturing Agreement are plausibly suspect when viewed in a light most favorable to Tasz. Although not expressed in the APA, Gupta communicated to Individual Defendants that Tasz was relying on director's insurance policies as a safety net in the event that the transactions did not turn out as expected. With this knowledge, Individual Defendants proceeded to sign the APA and insist on the Manufacturing Agreement as a condition. At no time did Individual Defendants disclose that Neocork's corporate charter had been revoked or that they intended to resign as directors as soon as the APA was executed. The fact that Neocork listed addresses for its board of directors as ITP's headquarters also raises questions of outside motivations influencing the decisions made by Neocork. At this preliminary stage, Tasz has stated a sufficient claim challenging Neocork's exercise of corporate existence apart from ITP and the influence of the Individual Defendants. Assuming the truth of the allegations and taking them in a light most favorable to Tasz, there are sufficient facts suggesting Individual Defendants ulterior motives controlled these business transactions. As such, Tasz has succeeded in stating a claim for piercing the corporate veil of Neocork.

*7.    Polychem's Counterclaim for Breach of Contract and Breach of Implied Covenants of Good Faith and Fair Dealing*

Polychem's first claim for relief alleges breach of the APA, the Cork Guarantee,[10] and the Manufacturing Agreement by ITP. (Doc. 34 at 23-25.) Polychem's second claim for relief alleges that ITP breached the implied covenants of good faith and fair dealing as to each of these contracts. Polychem's claim alleging breach of the Manufacturing Agreement and corresponding claim for breach of the Manufacturing Agreement's implied covenant of good faith and fair dealing are the only claims sufficient to survive Rule 12(b)(6) review.

As discussed in connection to Tasz's identical claim (page 13, *supra*), the only obligation of ITP arising from the APA was to enter into a manufacturing agreement with Tasz. Notably, and contrary to the allegations contained in Polychem's counterclaim, the APA makes no mention of an obligation of ITP to send "Tasz manufacturing equipment located at ITP's facility in Canada." (Doc. 34 at 24, ¶ 88.) Assuming such an obligation did exist, any claim for breach would only be proper for the party to whom the duty was owed, in this instance, Tasz. However, Tasz's Complaint does not make a similar allegation. Because Polychem has failed to allege a breach of an obligation arising from the APA, this claim is dismissed.

Turning to Polychem's claim for breach of the Cork Guarantee,[11] upon execution of the APA any payment obligations of Polychem under the Cork Guarantee were automatically

_____

[10] Polychem's counterclaim refers to the Cork Guarantee as the "April 27, 2010 agreement." (Doc. 34 at 23, ¶ 82.)

[11] The Court discussed the details of this agreement on pages 15-16, *supra*.

assigned to Tasz. This means that the only parties with standing to make a claim based on the Cork Guarantee are Tasz or ITP, as these are the only parties with obligations flowing from the contract. Assuming ITP did breach the Cork Guarantee by producing nonconforming cork, Polychem has not suffered any injury because it made no payments to ITP and any payments still owed are Tasz's responsibility.

Finally, Polychem was a party to the Manufacturing Agreement for the limited purpose of guaranteeing payments owed by Tasz. (Doc. 3-5 at 1) ("[Tasz] is a newly formed entity and [ITP] requested that Polychem guarantee payment of the purchase obligation herein.") Having already determined that Tasz has stated a plausible claim for relief for ITP's breach of the Manufacturing Agreement, Polychem will also be permitted to proceed with this claim and the corresponding claim for breach of the implied covenant of good faith and fair dealing. *Spartan Leasing Inc. v. Pollard*, 400 S.E.2d 476, 481 (N.C. App. 1991) ("The general rule is that a guarantor may plead a claim or defense which is available to his principal.") However, as a guarantor of Tasz's payment obligations, any potential remedy for Polychem arising from these claims would be limited to a declaration providing that Polychem owes no payment to ITP or a setoff reducing the amount owed by Polychem. *Id.* at 459, 481 ("A guarantor may not counterclaim for damages against a creditor but may assert a claim only by way of setoff.")

    *8.   Polychem's Counterclaim for Fraud and Fraudulent Inducement*

Polychem's third and fourth claims for relief allege fraud and fraudulent inducement by ITP, Hartman, and Cyr. These claims will be permitted to proceed in the same limited nature as Tasz's claims for fraud. *Spartan Leasing Inc.* 101 N.C. App. at 458, 400 S.E.2d at 481; (see

discussion on pages 17-18, *supra*.) Those claims for fraud or fraudulent inducement unrelated to misrepresentations of Neocork's corporate records are dismissed for the same reasons that the Court previously dismissed Tasz's identical claims.

9. *Polychem's Counterclaim for Violation of the NCUDTPA*

Polychem's fifth claim for relief alleges that ITP violated the NCUDTPA. To state a valid claim for violation of the UDTPA, a plaintiff must show: (i) that the defendant engaged in an unfair or deceptive act or practice; (ii) the act or practice was in or affecting commerce; and (iii) the act proximately caused injury to the plaintiff. *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 280 (4th Cir. 2012) (citing *Spartan Leasing*, 400 S.E.2d at 482); N.C. Gen. Stat. § 75-1-1 (2011). "An act is unfair when it is unethical or unscrupulous, and it is deceptive if it tends to deceive." *Id.* (citing *Marshall v. Miller*, 376 S.E.2d 397, 403 (N.C. 1981)).

Here, Polychem alleges identical facts in support of the NCUDTPA as those alleged by Tasz. Polychem's claims will be allowed to proceed on this claim for the same reasons that the Court allowed Tasz's claims to proceed. However, it is important to note that this claim by Polychem differs from those previously addressed by the Court. In prior claims for relief, the viability of Polychem's claims and resulting remedy was dependent upon being a guarantor of debts owed by Tasz. But here, Polychem was owed $400,000 by Neocork prior to the execution of the APA. (Doc. 3-2 at 15, ¶ 2.7(b)(ii).)  This could affect the remedies available to Polychem.

10. *Polychem's Counterclaims for Director and Officer Liability and Piercing the Corporate Veil*

Polychem's sixth claim for relief requests that this Court hold the Individual Defendants personally liable for the award in Tasz's State Court Default Judgment on the basis of breach of fiduciary duties. (Doc. 34 at 29, ¶ 134.) Polychem's seventh claim for relief asks for this Court to pierce Neocork's corporate veil, making Neocork's officers and directors responsible for the relief claimed in this suit. (*Id.*) In support of these claims, Polychem only refers to and incorporates the identical claims in Tasz's Complaint instead of pleading independently on its own behalf.

Polychem's request to pierce Neocork's corporate veil survives review for the same reasons provided in the Court's discussion of Tasz's identical request. (Discussed on pages 21-23, *supra*.) Polychem's claim for Individual Defendants' personal liability for breach of fiduciary duties will be dismissed for the reasons stated below.

Under Delaware law, "directors owe their fiduciary obligations to the corporation and its shareholders," and to creditors in the case of derivative actions, but not direct actions. *N. Am. Catholic Educ. Programming Found., Inc. v. Ghewalla*, 930 A.2d 92, 99, 103 (Del. 2007). Unlike Tasz, Polychem can claim creditor status in light of the $400,000 owed by Neocork to Polychem at the time of the alleged breaches of fiduciary duties. However, Polychem's claim must be dismissed because simply adopting the allegations from Tasz's Complaint also adopts Tasz's direct action which is an impermissible claim for a creditor to make under Delaware law. *Id.*

**B. Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction**

Individual Defendants have moved to dismiss Tasz's claims and Polychem's counterclaims arguing that this Court does not have personal jurisdiction. The Court will reserve ruling on these motions.

*1) Standard of Review and Analysis*

When a court's personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of proving, by a preponderance of the evidence, that grounds for jurisdiction exist. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993) (citing *Combs v. Baker*, 886 F.2d 673, 676 (4th Cir. 1989); *Dowless v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305, 1307 (4th Cir. 1986)). In making this decision, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in favor of the plaintiff. *Id.*

For actions removed to federal court from the state courts of North Carolina, the personal jurisdiction inquiry requires the court to ask whether its exercise of jurisdiction over an individual interferes with that individual's Fourteenth Amendment due process liberty interests. *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1065 (4th Cir. 1982) (the two-step personal jurisdiction analysis is collapsed into a single question of due process in actions removed to federal court from North Carolina) (citing *Dillon v. Numismatic Funding Corp.,* 231 S.E.2d 629, 630 (N.C. 1977) (holding that North Carolina's long-arm statute extends to the limits of due process.))

One surviving claim against the Individual Defendants is for piercing the corporate veil of Neocork. Additionally, Tasz and Polychem's claims against Hartman and Cyr for fraudulent representation of Neocork's financial records and violation of the NCUDTPA survived Rule 12(b)(6) analysis.

The lynchpin of the personal jurisdiction analysis depends upon the success of the claims for piercing the corporate veil of Neocork and fraud. If successful on the claim for piercing the corporate veil, the actions of the Individual Defendants would be attributable to them on an individual basis. *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).[12] Personal jurisdiction would then exist because Fitzgerald, Hartman, and Cyr would have negotiated, entered, and allegedly breached a contract with the damages resulting in North Carolina. Just as personal jurisdiction exists as to ITP in this dispute, if Tasz and Polychem are successful in piercing the corporate veil, personal jurisdiction would exist as to the alleged alter ego of ITP. In the same manner, if Tasz and Polychem are successful on the claim for fraud, North Carolina courts have recognized that officers and directors can be held personally liable for torts committed by them in their official capacities on behalf of the corporation and that personal jurisdiction does exist in connection to resulting claims. *Rich Food Servs., Inc. v. Rich Plan Corp.*, 5:99CV677-BR, 2001 WL 36210598 (E.D.N.C. May 12, 2001) (citing, among

---

[12] "As the Plaintiffs correctly point out, federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."

others, *United Artists Records, Inc. v. Eastern Tape Corp.*, 19 207, 215, 189 S.E.2d 452, 457, cert. denied, 200 S.E.2d 653 (N.C. 1973).)

Alternatively, it may be argued that if Tasz and Polychem's claims for fraud and piercing the corporate veil fail, the Court would not have personal jurisdiction over Hartman, Cyr, or Fitzgerald. The Individual Defendants contacts with North Carolina would amount to limited negotiations and execution of a contract with a North Carolina corporation in a representative capacity for a foreign corporation. *Columbia Briargate Co. v. First National Bank in Dallas,* 713 F.2d 1052, 1055 (4th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984) ("[i]f an officer does not personally participate in a corporation's tort, general corporate law does not subject him to liability simply by virtue of his office."); (Doc. 29 and attached exhibits.) Personal jurisdiction based on such limited contacts with the forum state would be a violation of the Individual Defendant's due process rights.

Here, Tasz and Polychem have pled claims for fraud and for piercing the corporate veil of Neocork sufficient to survive Rule 12(b)(6) analysis. However, this determination is made of thin cloth.  Therefore, the Court reserves ruling on Individual Defendants' motion to dismiss under Rule 12(b)(2) until discovery has taken place and the factual record has been more fully developed.

## C.  Defendants' Motion to Compel a More Definite Statement and Motion to Strike

Defendants have moved to compel a more definite statement as to Polychem's affirmative defenses and counterclaims contained in the Amended Answer to Third Party

Complaint and Counterclaims. (Doc. 39.) Defendants have also moved to strike these affirmative defenses and counterclaims. (Doc. 41.)

As far as they relate to Polychem's counterclaims, these motions are mooted as a result of the Court's analysis of Polychem's counterclaims. Any attempted counterclaims not addressed by the Court in this Memorandum and Order are dismissed for failure to comply with Federal Rule of Civil Procedure 8(a).

Turning to Polychem's affirmative defenses, the Court shares in Defendants' frustration with Polychem's manner of pleading. Polychem will not be allowed to incorporate the 147 allegations from Tasz's Complaint along with the 231 allegations contained in the State Court Default Judgment as affirmative defenses to ITP's claims against Polychem. There may be legitimate defenses contained in these 378 allegations, but it is not the role of Defendants or this Court to determine if that is the case. Federal Rule of Civil Procedure 8(c)(1) requires that a party "affirmatively state any avoidance or affirmative defense." Federal Rule of Civil Procedure 10(b) provides that affirmative defenses must be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Polychem has totally failed to comply with these parameters. As such, Defendants' Motion to Strike and Motion to Compel a More Definite Statement will be granted and Polychem is directed to amend and re-plead its affirmative defenses to ITP's Third-Party Complaint, such as they may be, in conformity with the Federal Rules of Civil Procedure.

### D. Tasz and Polychem's Motions to Dismiss Under Rule 12(b)(6)

Tasz and Polychem have moved to dismiss ITP's counterclaims and third-party complaint under Rule 12(b)(6). (Doc. 23 at 1.) ITP's counterclaims allege breach of the Manufacturing Agreement by Tasz (Doc. 3 at 40), request a declaratory judgment determining the rights and obligations of the parties under the agreements in issue (*id.* at 40), and the third-party complaint alleges breach of the Manufacturing Guarantee by Polychem. (*Id.* at 42.)

The extent of Tasz and Polychem's argument in support of their motions to dismiss is reproduced below.[13]

### MOTION TO DISMISS-RULE 12(b)(6)

Defendant's[sic] counterclaims and third party complaint should be dismissed pursuant to Rule 12(b)(6). Accordingly, Defendant's Answer reveals facts that warrant dismissal of counterclaims. In addition to other facts, Defendants responses to number allegations 24, 25 and 38, combined with other relevant admissions relieved Polychem and Tasz of any obligations and all purported duties referenced in the Counterclaims.

Doc. 23 at 1. (Tasz's Rule 12(b)(6) Motion.)

### MOTION TO DISMISS-RULE 12(b)(6)

Defendant's[sic] counterclaims and third party complaint should be dismissed pursuant to Rule 12(b)(6). Accordingly, Polychem's Answer reveals facts that warrant dismissal of counterclaims. In addition to other facts, Polychem's[sic] responses to number allegations 24, 25 and 38, combined with other relevant admissions relieved Polychem and Tasz of any obligations and all purported duties referenced in the Counterclaims.

Doc. 20 at 1. (Polychem's Rule 12(b)(6) Motion.)

---

[13] Neither Tasz nor Polychem filed a memorandum of law in support of their motions to dismiss.

Tasz and Polychem's motions to dismiss will be denied. Viewing the facts in favor of ITP, ITP has stated sufficient claims for declaratory judgment and breach of contract by Tasz and Polychem. Tasz and Polychem's reliance on their Answers to "reveal[] facts that warrant dismissal of counterclaims" lacks supporting analysis to direct the Court's attention to operative facts supporting their motions to dismiss.

## IV.     CONCLUSION

**IT IS, THEREFORE, ORDERD THAT:**

1)     Defendants' Motion to Dismiss (Doc. 4) is **GRANTED in part** and **DENIED in part** consistent with the terms of this Memorandum and Order.  Accordingly, the only causes of action advanced by Tasz that will proceed to discovery and / or summary judgment disposition are:

> Tasz's claim alleging ITP breached the Manufacturing Agreement (Claim One);
>
> With reference to the Manufacturing Agreement only, Tasz's claim alleging ITP breached the implied covenant of good faith and fair dealing (Claim Two);
>
> Tasz's claim alleging that ITP, Hartman and Cyr committed fraud via representations concerning Neocork's corporate records (Claim Three);
>
> Tasz's claim alleging ITP engaged in misappropriation of trade secrets and other intellectual property / confidential information (Claim Four);
>
> Tasz's claim alleging that ITP, Hartman, and Cyr violated the NCUDTPA (Claim Five): and
>
> Tasz's claim seeking to pierce the corporate veil of Neocork (Claim Six).

2)      Defendants' Motion to Dismiss Counterclaims of Polychem (Docs. 37, 39) is

**GRANTED in part** and **DENIED in part**.  Because Polychem essentially adopts the legal

position of Tasz, in similar fashion, Polychem's only surviving counterclaims include:

> Polychem's counterclaim alleging that ITP breached the Manufacturing Agreement (Claim One);

> With respect to the Manufacturing Agreement only, Polychem's counterclaim alleging that ITP breached the implied covenant of good faith and fair dealing (Claim Two);

> Polychem's counterclaims alleging that ITP, Hartman and Cyr committed fraud via representations concerning Neocork's corporate records (Claims Three and Four);

> Polychem's claim alleging that ITP, Hartman, and Cyr violated the NCUDTPA (Claim Five); and

> Polychem's claim seeking to pierce the corporate veil of Neocork (Claim Seven);

3)      The Court **RESERVES RULING** on the Individual Defendants' Motion to

Dismiss for Lack of Personal Jurisdiction (Docs. 6, 35).

4)      Defendants' Motion to Compel a More Definite Statement (Docs. 37, 39) and

Motion to Strike (Doc. 41) are both **GRANTED**.  For any surviving Polychem counterclaim, and

to the extent a claim is not already dismissed and the issue rendered moot, Polychem is hereby

ordered to amend its counterclaims and re–plead its affirmative defenses.

5)      Plaintiff Tasz's and Third-Party Defendant Polychem's Motions to Dismiss

Counterclaims and Third-Party Complaint (Docs. 23, 34) are hereby **DENIED**.

6)      ITP's Rule 41(b) Motion to Dismiss for Lack of Prosecution (Doc. 54) is

**DENIED**.

Signed:   January 20, 2015

Richard L. Voorhees
United States District Judge